**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JACOB CURTIS, derivatively on behalf of TEMPUS AI, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>ERIC LEFKOFSKY, JIM ROGERS, PETER J. BARRIS, ERIC D. BELCHER, JENNIFER A. DOUDNA, DAVID R. EPSTEIN, WAYNE A.I. FREDERICK, SCOTT GOTTLIEB, THEODORE J. LEONSIS, and NADJA WEST,<br><br>Defendants,<br><br>and<br><br>TEMPUS AI, INC.,<br><br>Nominal Defendant. | Case No.: 1:25-cv-9866<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:**<br><br>**(1) VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934;**<br>**(2) BREACH OF FIDUCIARY DUTY;**<br>**(3) UNJUST ENRICHMENT;**<br>**(4) ABUSE OF CONTROL;**<br>**(5) GROSS MISMANAGEMENT; AND**<br>**(6) WASTE OF CORPORATE ASSETS**<br><br>JURY TRIAL DEMANDED |

# VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Jacob Curtis ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Tempus AI, Inc. ("Tempus" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants Eric Lefkofsky ("Lefkofsky"), Jim Rogers ("Rogers"), Peter J. Barris ("Barris"), Eric D. Belcher ("Belcher"), Jennifer A. Doudna ("Doudna"), David R. Epstein ("Epstein"), Wayne A.I. Frederick ("Frederick"), Scott Gottlieb ("Gottlieb"), Theodore J. Leonsis ("Leonsis"), and Nadja West ("West") (collectively, the "Individual Defendants," and together with Tempus, the "Defendants")

for breaches of their fiduciary duties as controlling shareholder, directors, and/or officers of Tempus, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution against Defendants Lefkofsky and Rogers under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Tempus, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Tempus' directors and officers from August 6, 2024, to May 27, 2025, inclusive (the "Relevant Period").

2. Tempus is a Nevada corporation headquartered in Illinois, which claims to advance the field of precision medicine through its laboratory diagnostics service also known as intelligent diagnostics. The Company's intelligent diagnostics utilizes artificial intelligence ("AI"), including generative AI, which combines laboratory results with a patient's personal clinical data.

3. The Company offers several categories of products, revolving around laboratory data. Tempus provides, *inter alia*, genomic sequencing, access to clinical databases, and support for clinical trials. Although the Company positions itself as being AI-based, the majority of its

revenue has derived from genomic testing, data licensing agreements, and business acquisitions.

4. Notably, during the Relevant Period the Company announced an expansion in its contract with AstraZeneca through a joint venture between Tempus, AstraZeneca, and Pathos AI. In addition, the Company announced another joint venture with Japan's Softbank Group Corporation ("Softbank") to assist in its expansion into the Japanese market. Moreover, the Company acquired Ambry Genetics ("Ambry") during the Relevant Period.

5. Throughout the Relevant Period, the Individual Defendants failed to convey the true nature of the Company's contractual agreements and business acquisitions. More specifically, the Individual Defendants reassured investors of the quality and the stability of the Company's licensing agreements, joint ventures, and business acquisitions.

6. For instance, on November 4, 2024, the Company issued a press release to announce its financial and operational results for the third quarter of 2024 ended September 30, 2024, which it also filed on Form 8-K with the SEC (the "Q3 2024 Press Release"). The Q3 2024 Press Release quoted Defendant Lefkofsky, who stated with regard to the Company's acquisition of Ambry, "Ambry is uniquely positioned given that its revenues are currently growing at north of 25% a year and it generates meaningful EBITDA and cash flow."

7. The truth would not emerge until May 28, 2025, with the release of a report by the investment management firm Spruce Point (the "Spruce Point Report"). The Spruce Point Report noted multiple red flags notably that: (a) Defendant Lefkofsky and others he affiliates with have a history of cashing out of companies before public shareholders begin to incur losses; (b) the Company's AI abilities were overstated; (c) multiple executives and members of the Company's Board of Directors ("Board") have been affiliated with companies that restated financial results; (d) the Company's accounting and financial reporting appeared aggressive; (e) the AstraZeneca

and Pathos AI deals required greater scrutiny; and (f) the Company had recently revised its financial guidance in a way that showed weakness at its core.

8. On this news, the price per share of Tempus stock fell $12.67, or roughly 19.23%, from its closing price on May 27, 2025 of $65.87 per share to close on May 28, 2025 at $53.20 per share.

9. During the Relevant Period, the investing public was under a false impression of the Company's business, operations, and financial success.

10. Moreover, during the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Tempus, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) a substantial number of the Company's contractual agreements were with related parties, self-funded, or otherwise included non-binding opt-ins; (2) as a result of the foregoing, the Company's contractual agreements were neither as assured nor as profitable as previously disclosed to investors; (3) Tempus' joint venture with SoftBank carried undertones of "round-tripping" capital to generate revenue for the Company; (4) as a result of these undertones, Tempus' joint venture was neither as credibly nor as substantive as previously disclosed to investors; (5) Tempus' acquisition of Ambry generated substantial risk to the Company given Ambry's ethically questionable billing practices; (6) AstraZeneca engaged in a "pass-through payment" through a joint agreement with itself, the Company, and Pathos AI; (7) as a result of AstraZeneca's pass-through payment, its financial commitments to Tempus were significantly reduced; and (8) the Company failed to maintain internal controls. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and

misleading and lacked a reasonable basis at all relevant times.

11. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

12. In addition, during the Relevant Period, six of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider trading while the Company's stock was artificially inflated as a result of the Individual Defendants' false and misleading statements discussed herein, reaping combined total proceeds of approximately $269.3 million.

13. In light of the Individual Defendants' misconduct—which has subjected the Company, its Founder, Chief Executive Officer ("CEO") and Chairman of the Board, and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in this Court (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

14. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

15. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the

Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

17. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19. Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either reside or maintain executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

20. Plaintiff Jacob Curtis is a current shareholder of Tempus. Plaintiff has continuously held Tempus stock at all relevant times.

### Nominal Defendant Tempus

21. Tempus is a Delaware corporation with its principal executive offices at 600 West Chicago Avenue, Suite 510, Chicago, IL 60654. Tempus' shares trade on The Nasdaq Stock Market LLC ("NASDAQ") under the ticker symbol "TEM."

**Defendant Lefkofsky**

22. Defendant Lefkofsky is the Company's founder, CEO, Chairman of the Board, and has served as a Company director since its inception in August 2015. He also currently serves as a member of the Executive Committee. According to the Schedule 14A filed with the SEC on April 7, 2025 (the "2025 Proxy Statement"), as of March 18, 2025, Defendant Lefkofsky owned 39,825,028 shares of the Company's Class A common stock, as well as 5,043,789 shares of the Company's Class B common stock, giving Defendant Lefkofsky 59.9% voting power over the Company. Thus, Defendant Lefkofsky is a controlling shareholder of the Company.

23. For the 2024 Fiscal Year, Defendant Lefkofsky received $28,555,040 in total compensation from the Company. This included $800,000 in bonuses, $27,750,000 in stock awards, and $5,040 in all other compensation.

24. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Lefkofsky made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| January 23, 2025 | 145,450 | $53.36 | $7,761,212 |
| January 24, 2025 | 85,788 | $53.95 | $4,580,274 |
| January 29, 2025 | 79,118 | $54.11 | $4,261,125 |
| January 30, 2025 | 77,626 | $54.63 | $4,240,708 |
| January 31, 2025 | 82,056 | $58.88 | $4,776,799 |
| February 5, 2025 | 74,485 | $67.56 | $5,030,067 |
| February 6, 2025 | 85,109 | $68.50 | $5,778,114 |
| February 7, 2025 | 80,388 | $67.80 | $5,428,398 |

| | | | |
|---|---|---|---|
| February 12, 2025 | 84,948 | $70.02 | $5,948,059 |
| February 13, 2025 | 78,594 | $78.54 | $6,170,792 |
| February 14, 2025 | 80,003 | $86.13 | $6,862,467 |
| February 19, 2025 | 84,640 | $81.09 | $6,844,680 |
| February 20, 2025 | 69,231 | $74.09 | $5,129,325 |
| February 27, 2025 | 3,240,234 | $58.75 | $190,363,748 |
| May 20, 2025 | 16,752 | $63.46 | $1,058,905 |

Thus, in total, before the fraud was exposed, he sold 4,364,422 shares of Company stock on inside information, for which he received approximately $264.2 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

25. The Company's Schedule 14A filed with the SEC on April 7, 2025 (the "2025 Proxy Statement") stated the following about Defendant Lefkofsky:

> **Eric Lefkofsky** is our Founder and has served as our Chief Executive Officer and a member of our board of directors since our inception. Before founding Tempus, Mr. Lefkofsky co-founded Groupon, Inc. in 2008, where he held various roles, including member of the board of directors (through November 2023), Chairman of the board of directors (November 2015 to June 2020), Executive Chairman (through August 2013) and Chief Executive Officer (August 2013 to November 2015). Mr. Lefkofsky also co-founded Lightbank LLC in 2008, a private venture capital firm specializing in investments in technology companies, and has served as its managing member since inception and General Partner since January 2019. Mr. Lefkofsky also co-founded InnerWorkings, Inc., Mediaocean, LLC, Echo Global Logistics, Inc., and Pathos AI, Inc., and served on each company's board of directors or board of managers. In addition, Mr. Lefkofsky has served on the board of directors of Northwestern Memorial Healthcare since February 2024. Mr. Lefkofsky holds a bachelor's degree from the University of Michigan and a J.D. from the University of Michigan Law School. We believe that Mr. Lefkofsky is qualified to serve on our board of directors because of his perspective and experience as our Founder and Chief Executive Officer, and his extensive knowledge of the venture capital and technology industries.

**<u>Defendant Rogers</u>**

26. Defendant Rogers has served as the Company's CFO since April 2021, and previously served as the Company's Senior Director of Finance from August 2017 to April 2020 and as the Company's Vice President of Finance from April 2020 to April 2021.

27. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Rogers made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| February 5, 2025 | 8,712 | $67.57 | $588,670 |
| February 18, 2025 | 31,780 | $84.78 | $2,616,308 |
| February 19, 2025 | 1,540 | $82.10 | $126,086 |
| May 20, 2025 | 23,121 | $63.78 | 1,462,809 |

Thus, in total, before the fraud was exposed, he sold 65,153 shares of Company stock on inside information, for which he received approximately $4.79 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

28. The 2025 Proxy Statement stated the following about Defendant Rogers:

> ***James Rogers*** has served as our Chief Financial Officer since April 2021. Prior to this, Mr. Rogers served as our Vice President of Finance from April 2020 to April 2021 and as our Senior Director of Finance from August 2017 to April 2020. Prior to joining us, Mr. Rogers held various finance positions at Groupon, Inc. from April 2011 to August 2017, including most recently leading FP&A for the North America business from February 2017 to August 2017 and serving as the financial controller of Asia Pacific operations from January 2015 to January 2017. Mr. Rogers holds a B.B.A. from the University of Notre Dame and an M.S. from Northern Illinois University.

**<u>Defendant Barris</u>**

29. Defendant Barris has served as a Company director since September 2017. He also

currently serves as the Chair of the Compensation Committee, a member of the Audit Committee, and a member of the Executive Committee.

30. For the 2024 Fiscal Year, Defendant Barris received $537,518 in total compensation from the Company. This included $37,500 in fees earned or paid in cash and $500,018 in stock awards.

31. The 2025 Proxy Statement stated the following about Defendant Barris:

> ***Peter J. Barris*** has served as a member of our board of directors since September 2017. Mr. Barris currently serves on the board of directors of Sprout Social, Inc. (Nasdaq: SPT) since February 2011. Previously, Mr. Barris served on the board of directors of Berkshire Grey, Inc. from April 2016 to July 2023, ZeroFox Holdings, Inc. from April 2014 to June 2023, NextNav Inc. from July 2014 to August 2022 and Groupon from January 2008 to August 2022. Mr. Barris joined New Enterprise Associates, Inc., or NEA, a global venture capital fund investing in technology and healthcare, where he specialized in information technology investing, in 1992 and retired at the end of 2019. Prior to his retirement, Mr. Barris held several roles at NEA, including Managing General Partner from 1999 to 2017. After retiring in 2019, Mr. Barris now serves as Chairman Emeritus of NEA. Mr. Barris holds a B.S. from Northwestern University and an M.B.A. from the Tuck School of Business at Dartmouth University. We believe that Mr. Barris is qualified to serve on our board of directors because of his investment management and financial expertise, and his experience serving on public company boards.

**<u>Defendant Belcher</u>**

32. Defendant Belcher has served as a Company director since January 2019, and currently serves as the Chair of the Audit Committee.

33. For the 2024 Fiscal Year, Defendant Belcher received $531,268 in total compensation from the Company. This included $31,250 in fees earned or paid in cash and $500,018 in stock awards.

34. The 2025 Proxy Statement stated the following about Defendant Belcher:

> ***Eric D. Belcher*** has served as a member of our board of directors since January 2019. Mr. Belcher has served as the Chief Executive Officer of Market Track, LLC (d/b/a Numerator), a data and technology company in the market research industry, since June 2019. Mr. Belcher has also held various positions at InnerWorkings, Inc.

> since May 2005, including most recently serving as its Chief Executive Officer and President from January 2009 to April 2018. Mr. Belcher served as a member of the board of directors of InnerWorkings, Inc. from January 2009 to December 2018, including as the Chairman of its board of directors from April 2018 to September 2018. Mr. Belcher holds a bachelor's degree from Bucknell University and an M.B.A. from the University of Chicago Booth School of Business. We believe that Mr. Belcher is qualified to serve on our board of directors because of his extensive experience in the technology industry and leading high growth companies.

**<u>Defendant Doudna</u>**

35. Defendant Doudna has served as a Company director since April 2021, and currently serves as a member of the Nominating and Corporate Governance Committee.

36. For the 2024 Fiscal Year, Defendant Doudna received $550,018 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $500,018 in stock awards.

37. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Doudna made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| February 14, 2025 | 1,320 | $90.00 | $118,800 |
| March 3, 2025 | 338 | $57.52 | $19,442 |

Thus, in total, before the fraud was exposed, she sold 1,658 shares of Company stock on inside information, for which she received $138,242 in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates her motive in facilitating and participating in the scheme.

38. The 2025 Proxy Statement stated the following about Defendant Doudna:

> ***Jennifer A. Doudna, Ph.D***. has served as a member of our board of directors since April 2021. Dr. Doudna has also served on the board of directors of Johnson &

Johnson since April 2018. Since July 2002, Dr. Doudna has served as a Professor of Biochemistry & Molecular Biology at University of California, Berkeley, where she directs the Innovative Genomics Institute, a joint UC Berkeley-UC San Francisco center, holds the Li Ka Shing Chancellor's Professorship in Biomedical and Health, and is the Chair of the Chancellor's Advisory Committee on Biology. Since 2002, Dr. Doudna has served as Principal Investigator at the Doudna Lab at UC Berkeley. Dr. Doudna has founded and served on the Scientific Advisory Boards of Caribou Biosciences, Inc. and Intellia Therapeutics, Inc., since 2010, both leading CRISPR genome engineering companies, since 2010. She has also been an Investigator with the Howard Hughes Medical Institute since 1997. Dr. Doudna is the recipient of numerous scientific awards in biochemistry and genetics, including the Nobel Prize in Chemistry in 2020. Dr. Doudna holds a bachelor's degree from Pomona College and a Ph.D. from Harvard Medical School. We believe that Dr. Doudna is qualified to serve on our board of directors because of her expertise in scientific research and innovation.

**Defendant Epstein**

39. Defendant Epstein has served as a Company director since February 2024. He also currently serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee.

40. For the 2024 Fiscal Year, Defendant Epstein received $1,092,318 in total compensation from the Company. This included $25,000 in fees earned or paid in cash and $1,067,318 in stock awards.

41. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Epstein made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| February 3, 2025 | 370 | $53.31 | $19,725 |
| March 3, 2025 | 250 | $57.52 | $14,380 |
| May 1, 2025 | 370 | $53.50 | $19,795 |

Thus, in total, before the fraud was exposed, he sold 990 shares of Company stock on inside

information, for which he received $53,900 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

42. The 2025 Proxy Statement stated the following about Defendant Epstein:

> ***David R. Epstein*** has served as a member of our board of directors since February 2024. Mr. Epstein has served as the Chairman and Chief Executive Officer of Ottimo Pharma Limited since October 2024. Mr. Epstein also serves as a board member at privately held biotherapeutics companies, Valo Health, LLC, Shape Therapeutics, Inc., and Agomab Therapeutics NV. He is a Director at the non-profit Three Opinions Foundation Inc and at South Florida's Pelican Harbor Seabird Station. Mr. Epstein previously served as the Chief Executive Officer and a member of the board of directors of Seagen Inc. (Nasdaq: SGEN) from November 2022 until Seagen's acquisition by Pfizer Inc. in December 2023. From October 2021 to December 2023, Mr. Epstein served on the board of directors of OPY Acquisition Corp. I (Nasdaq: OHAA). From June 2022 to June 2023, Mr. Epstein served as a member of the board of directors of Senti Biosciences, Inc. (Nasdaq: SNTI) and was previously a member of the board of Senti's predecessor, Dynamics Special Purpose Corp. (Nasdaq: DYNS) since March 2021. From March 2017 to February 2023, he served as a director at Evelo Biosciences, Inc. (Nasdaq: EVLO), including as the Chair of its board of directors from September 2019 to June 2022. From 2017 until October 2022, Mr. Epstein was a consultant and executive partner at Flagship Pioneering. From May 2019 to October 2022, Mr. Epstein served on the board of directors and as Chairman of Axcella Health Inc. (formerly Axcella Therapeutics) (Nasdaq: AXLA) and, from January 2017 to October 2022, Mr. Epstein served on the board of directors of Rubius Therapeutics, Inc. (Nasdaq: RUBY). From 2010 to mid-2016, he served as the Chief Executive Officer of Novartis Pharmaceuticals, a division of Novartis AG. Previously, he started and led Novartis' Oncology and Molecular Diagnostic units. Under his leadership, Norvartis' oncology business grew to the second largest in the world. Early in his career, he was an associate in the strategy practice of consulting firm Booz, Allen and Hamilton. Mr. Epstein holds a B.S. in pharmacy from Rutgers University College of Pharmacy and an M.B.A. in finance and marketing from Columbia University Graduate School of Business. We believe that Mr. Epstein is qualified to serve on our board of directors because of his extensive experience serving in executive roles in the life sciences industry and leading the development and commercialization of numerous therapeutics.

**<u>Defendant Frederick</u>**

43. Defendant Frederick has served as a Company director since October 2020, and currently serves as a member of the Audit Committee.

44. For the 2024 Fiscal Year, Defendant Frederick received $550,018 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $500,018 in stock awards.

45. The 2025 Proxy Statement stated the following about Defendant Frederick:

> ***Wayne A.I. Frederick, M.D***. has served as a member of our board of directors since October 2020. Since November 2024, Dr. Frederick has served as interim Chief Executive Officer of the American Cancer Society and its advocacy affiliate, the American Cancer Society Cancer Action Network. Dr. Frederick has also served on the boards of directors of several other public companies, including serving as a member of the board of directors of Workday, Inc. since July 2022, Insulet Corp since October 2020 and Humana Inc. since February 2020. From July 2020 to October 2022, Dr. Frederick served as a member of the board of directors of Forma Therapeutics Holdings, Inc. He also serves on the boards of directors of privately held companies and charitable organizations. Dr. Frederick is currently the President Emeritus of Howard University, after serving as President since July 2014, and also serves as the Charles R. Drew Endowed Chair of Surgery at Howard University's College of Medicine. Dr. Frederick holds a B.S./M.D. dual degree, and an M.B.A. from Howard University. We believe that Dr. Frederick is qualified to serve on our board of directors because of his vast experience in medical research, healthcare academics and business administration, and his service on the boards of multiple public companies.

**<u>Defendant Gottlieb</u>**

46. Defendant Gottlieb has served as a Company director since October 2019, and currently serves as a member of the Nominating and Corporate Governance Committee.

47. For the 2024 Fiscal Year, Defendant Gottlieb received $556,268 in total compensation from the Company. This included $56,250 in fees earned or paid in cash and $500,018 in stock awards.

48. The 2025 Proxy Statement stated the following about Defendant Gottlieb:

> ***Scott Gottlieb, M.D.*** has served as a member of our board of directors since October 2019. Dr. Gottlieb has also served on the boards of directors of Illumina, Inc. since February 2020 and Pfizer Inc. since June 2019. Dr. Gottlieb has served as a Partner on NEA's healthcare investment team since April 2019, and a Resident Fellow at American Enterprise Institute since April 2021. Prior to that, he served as the 23rd Commissioner of the U.S. Food and Drug Administration from May 2017 to April 2019. Prior to serving as Commissioner, Dr. Gottlieb held several roles in the public

> and private sectors, including serving as a Venture Partner at NEA from January 2007 to May 2017, and a senior advisor to the Administrator of the Centers for Medicare and Medicaid Services in 2004. He is presently a contributor to CNBC and the CBS News program Face the Nation. He also currently serves on the executive committee of the Mount Sinai Health System's board of directors and co-chairs the board's education committee. In addition, Dr. Gottlieb serves on the board of directors of Wesleyan University. Dr. Gottlieb holds a B.A. from Wesleyan University and an M.D. from Mount Sinai School of Medicine. We believe that Dr. Gottlieb is qualified to serve on our board of directors because of his extensive experience as a medical policy expert and public health advocate.

**<u>Defendant Leonsis</u>**

49. Defendant Leonsis has served as a Company director since January 2019. He also currently serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Executive Committee.

50. For the 2024 Fiscal Year, Defendant Leonsis received $531,268 in total compensation from the Company. This included $31,250 in fees earned or paid in cash and $500,018 in stock awards.

51. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Leonsis made the following sale of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| May 9, 2025 | 770 | $66.26 | $51,020 |

Thus, in total, before the fraud was exposed, he sold 770 shares of Company stock on inside information, for which he received $51,020 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

52. The 2025 Proxy Statement stated the following about Defendant Leonsis:

> ***Theodore J. Leonsis*** has served as a member of our board of directors since January

2019. In November 2011, Mr. Leonsis co-founded Revolution Growth, a private investment firm, and has served as a General Partner thereof since that time. Since 1999, Mr. Leonsis has served as the Founder, Chairman, Majority Owner, and Chief Executive Officer of Monumental Sports & Entertainment, LLC, a sports, entertainment, media, and technology company that owns the NBA's Washington Wizards, the NHL's Washington Capitals, the WNBA's Washington Mystics, the Capital City Go-Go, Wizards District Gaming, Caps Gaming, and Monumental Sports Network. Mr. Leonsis has served as a director of American Express Co. since July 2010. Mr. Leonsis has also served on the board of directors of Groupon, Inc. since June 2009, including as Chairman of the board of directors from August 2013 to November 2015 and, again, since June 2020. Mr. Leonsis also serves on the boards of directors of several private internet and technology companies, as well as charitable organizations. Mr. Leonsis holds a bachelor's degree from Georgetown University. We believe that Mr. Leonsis is qualified to serve on our board of directors because of his significant operational, investment and financial experience, and his service on the boards of two public companies.

**Defendant West**

53. Defendant West has served as a Company director since April 2021, and currently serves as a member of the Compensation Committee.

54. For the 2024 Fiscal Year, Defendant West received $550,018 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $500,018 in stock awards.

55. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant West made the following sale of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| March 4, 2025 | 160 | $53.24 | $8,518 |

Thus, in total, before the fraud was exposed, she sold 160 shares of Company stock on inside information, for which she received $8,518 in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates her motive in facilitating and participating in the scheme.

56. The 2025 Proxy Statement stated the following about Defendant West:

> ***Nadja West, M.D.*** has served as a member of our board of directors since April 2021. Dr. West has also served on the boards of directors of several other public companies, including serving as a member of the board of directors of Johnson & Johnson since December 2020, Tenet Healthcare Corp since October 2019, and Nucor Corporation since September 2019. From December 2015 to October 2019, Dr. West served as the 44th Surgeon General of the U.S. Army, and the Commanding General of the U.S. Army Medical Command. Dr. West currently serves as Trustee of both the National Recreation Foundation and Mount St. Mary's University, and board member of The Woodruff Foundation. She was recently appointed an independent member of the NCAA Board of Governors. Dr. West holds a B.S. from the United States Military Academy at WestPoint, an M.D. from The George Washington University School of Medicine, and an M.S. from National War College. We believe that Dr. West is qualified to serve on our board of directors because of her executive and operational leadership and expertise with strategic planning and healthcare management.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

57. By reason of their positions as controlling shareholder, officers, and/or directors of Tempus and because of their ability to control the business and corporate affairs of Tempus, the Individual Defendants owed Tempus and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Tempus in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Tempus and its shareholders so as to benefit all shareholders equally.

58. Each controlling shareholder, director and officer of the Company owes to Tempus and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

59. The Individual Defendants, because of their positions of control and authority as controlling shareholder, directors, and/or officers of Tempus, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

60. To discharge their duties, the controlling shareholder, officers, and directors of Tempus were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

61. Each Individual Defendant, by virtue of his or her position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholder, directors, and officers of Tempus, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also controlling shareholder, officers, and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Tempus' Board at all relevant times.

62. As controlling shareholder, senior executive officers, and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in

this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

63. To discharge their duties, the controlling shareholder, officers, and directors of Tempus were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Tempus were required to, among other things:

(a) ensure that the Company operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Nevada, Illinois, and the United States, and pursuant to Tempus' own Code of Conduct and Ethics;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Tempus conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Tempus and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Tempus' operations would comply with all applicable laws and Tempus' financial statements and regulatory filings filed with the SEC and

disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

64. Each of the Individual Defendants further owed to Tempus and the shareholders the duty of loyalty requiring that each favor Tempus' interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

65. At all times relevant hereto, the Individual Defendants were the agents of each other and of Tempus and were at all times acting within the course and scope of such agency.

66. Because of their advisory, executive, managerial, and directorial positions with Tempus, each of the Individual Defendants had access to adverse, non-public information about the Company.

67. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Tempus.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

68. In committing the wrongful acts alleged herein, the Individual Defendants have

pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

69. The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of the Exchange Act.

70. The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Tempus was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

71. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to assist substantially the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

72. At all times relevant hereto, each of the Individual Defendants was the agent of

each of the other Individual Defendants and of Tempus and was at all times acting within the course and scope of such agency.

## TEMPUS' CODE OF CONDUCT

***Code of Conduct and Ethics***

73. The Company's Code of Conduct (the "Code of Conduct") states that it "applies to everyone at every level of Tempus … include[ing] employees, officer[s], directors, and anyone conducting business on Tempus' behalf, such as contractors, consultants, and suppliers."

74. The Code of Conduct provides, in a section titled "Waivers," that:

> Any waiver of this Code for Tempus executive officers or directors may be authorized only by our Board of Directors or, when permitted, a committee of the Board of Directors, and will be disclosed to stockholders as required.

75. The Code of Conduct provides, in a section titled "Selection of and Interactions with Business Partners," that:

> Tempus expects all of its employees to conduct their interactions with vendors and business partners with integrity and in full compliance with applicable laws. Tempus should conduct business with vendors who share and embrace the letter and spirit of this Code and our values.

76. The Code of Conduct provides, in a section titled "Avoid Conflicts of Interest," that

> We owe a duty to Tempus, each other, and our shareholders to put Tempus' interests above our own when it comes to how we do our job. Our personal interests should not inappropriately influence our professional judgment. By recognizing and taking proactive steps to prevent conflicts of interest, or even the appearance of conflict, we send a clear message about our commitment to Tempus' integrity and doing what's right.
>
> Conflicts of interest arise when a Tempus employee's personal interests or responsibilities (financial or otherwise) are inconsistent with those of Tempus. We should not take part in or try to influence any decisions or situations in which we have a conflict of interest. The best course of action is to disclose the facts early and often, discuss the situation, and decide with your manager on an appropriate solution.

> If you are involved in selecting a Tempus business partner or vendor, follow any applicable internal policies and processes and make decisions based on Tempus' needs and objective criteria – never on personal bias, benefit, or interests.

77. The Code of Conduct provides, in a section titled "Corporate Opportunities," that:

> You may not take personal advantage of opportunities that arise from your position with us or through your use of Tempus' property or information. Even opportunities that are acquired privately by you may be questionable if they are related to our existing or proposed lines of business. Significant participation in an investment or outside business opportunity that is directly related to our lines of business must be pre-approved by the Legal Team.

78. The Code of Conduct provides, in a section titled "Securities Laws and Insider Trading," that:

> While engaged in Tempus business, you may have access to or learn of confidential or proprietary information that has not been disclosed to the public. It is illegal to buy or sell securities (for example, stocks, bonds or options) of a company when you are aware of "inside information"—material, non-public information — relating to the company. It is also illegal to discuss such information with others outside of Tempus. Please consult the Tempus Insider Trading Policy for more detailed information about these requirements.

79. The Code of Conduct provides, in a section titled "Financial and Business Records," that:

> Our shareholders depend on our honesty and integrity, particularly when measuring the financial performance or strength of Tempus. It is crucial that we maintain ethical and honest accounting practices at all times and so that our company's financial information is accurate and complete. We require that:
>
> ▪ no entry be made in our books and records that intentionally hides or disguises the nature of any transaction or of any of our liabilities or misclassifies any transactions as to accounts or accounting periods;
>
> ▪ transactions be supported by appropriate documentation;
>
> ▪ the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in our books and records;
>
> ▪ employees comply with our system of internal controls; and
>
> ▪ no cash or other assets be maintained for any purpose in any unrecorded

> or "off-the-books" fund.
>
> We also rely upon our accounting and other business and corporate records in preparing publicly filed reports. Employees who contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is complete, accurate and transparent.

80. The Code of Conduct provides, in a section titled "Communicating About Tempus," that:

> We only disclose material information about Tempus to the public through specific limited channels to avoid inappropriate publicity and to ensure that all those with an interest in Tempus will have equal access to information. If you are contacted by the media about Tempus, direct all inquiries to our Communications Team. Let them handle it and do not respond unless authorized by them.

81. In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violation of the Exchange Act. Moreover, six of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Additionally, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

**<u>TEMPUS' AUDIT COMMITTEE CHARTER</u>**

82. The Company's Audit Committee Charter states that the purpose of the Audit Committee is to:

> ● oversee the Company's accounting and financial reporting processes, systems of internal control, financial statement audits, and the integrity of the Company's financial statements;
>
> ● manage the selection, engagement terms, fees, qualifications, independence, and performance of the registered public accounting firms engaged as the Company's

> independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services (the "***Auditors***");
>
> ● maintain and foster an open avenue of communication with the Company's management, internal audit group (if any), and Auditors;
>
> ● review any reports or disclosures required by applicable law and stock exchange listing requirements;
>
> ● oversee the design, implementation, organization, and performance of the Company's internal audit function (if any);
>
> ● help the Board oversee the Company's legal and regulatory compliance, including risk assessment; and
>
> ● provide regular reports and information to the Board.

83. The Audit Committee Charter outlines the responsibilities of the Audit Committee, which include, among other things:

> The Committee's responsibilities are for oversight, as described under "Purpose" above. The members of the Committee are not employees of the Company, and they do not perform management's or any Auditors' functions. The Committee relies on the expertise and knowledge of management, the internal auditors (if any), and any Auditors in carrying out its oversight responsibilities. Management is responsible for preparing accurate and complete financial statements in accordance with generally accepted accounting principles ("GAAP"), crafting periodic reports, and establishing and maintaining appropriate accounting principles and financial reporting policies and satisfactory internal control over financial reporting. The Auditors will audit the Company's annual consolidated financial statements and, when required, the effectiveness of the Company's internal control over financial reporting and review the Company's quarterly financial statements. It is not the Committee's responsibility to prepare or certify the Company's financial statements, guarantee the audits or reports of the Auditors, certify as to whether any Auditors are "independent" under applicable law or stock exchange listing requirements, or ensure that the financial statements or periodic reports are complete and accurate, conform to GAAP, or otherwise comply with applicable law or stock exchange listing requirements or the Company's policies.
>
> The Committee shall have the following responsibilities: provided, however, that this list of responsibilities is intended to be a guide and to remain flexible to account for changing circumstances and needs. Accordingly, the Committee may depart from or supplement such responsibilities, and establish policies and procedures, to the extent permitted by applicable law and stock exchange listing requirements.
>
> * * *

*Financial Review and Disclosure*

5. **Annual Audit Results**. The Committee will review with management and the Auditors the results of the Company's annual financial statement audit, including:

   ● the Auditors' assessment of the quality of the Company's accounting principles and practices;

   ● the Auditors' views about qualitative aspects of the Company's significant accounting practices and the reasonableness of significant judgments and estimates (including material changes in estimates and analyses of the effects of alternative GAAP methods on the financial statements);

   ● all misstatements identified during the audit (other than those the Auditors believe to be trivial);

   ● the adequacy of the disclosures in the financial statements; and

   ● any other matters that the Auditors must communicate to the Committee under applicable accounting or auditing standards.

6. **Audited Financial Statement Review; Quarterly and Annual Reports**. The Committee will review the annual audited financial statements, the quarterly financial statements and the Company's "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Risk Factors," as appropriate, with management and the Auditors. The Committee will be responsible for recommending to the Board whether the proposed annual audited financial statements should be included in the Company's Annual Report on Form 10-K.

7. **Earnings Announcements**. The Committee will review and discuss with management and the Auditors any proposed earnings press releases and other financial information and guidance regarding the Company's results of operations provided publicly or to ratings agencies (including, without limitation, reviewing any pro forma or non-GAAP information).

8. **Proxy Report.** The Committee will oversee the preparation of any report of the Committee required by applicable law or stock exchange listing requirements to be included in the Company's annual proxy statement.

9. **Accounting Principles and Policies.** The Committee will review and discuss with management and the Auditors significant issues regarding accounting principles and financial statement presentation, including:

   ● critical accounting policies and practices;

- alternative accounting policies available under GAAP;

- the potential impact on the Company's financial statements of alternative treatments and any off-balance sheet structures; and

- any other significant reporting issues and judgments, significant regulatory, legal, and accounting initiatives, or developments that may have a material impact on the Company's financial statements, compliance programs, and policies.

The Committee will review with the Auditors and management, if appropriate, any written communication, such as any management letter or internal-control letter, and monitor management's response to such communications.

10. **Auditor Communications**. At least annually, the Committee will discuss with the Auditors the matters required to be discussed by Auditing Standard No. 1301, Communications with Audit Committees, as adopted by the PCAOB (including any successor rule adopted by the PCAOB).

11. **Management Cooperation with Audit.** The Committee will evaluate management's cooperation with the Auditors during their audit examination, including any significant difficulties or disagreements encountered during the audit, if any.

12. **National Office Communications**. To review with the Auditors, as appropriate, communications between the audit team and the Auditors' national office with respect to accounting or auditing issues presented by the engagement.

***Internal Control and Procedures***

13. **Risk Assessment and Management**. The Committee will review and discuss with management and the Auditors the Company's processes and policies on risk identification, management and assessment in all areas of the Company's business, but the Board shall continue to have overall responsibility for evaluating key business risks faced by the Company, including but not limited to information security, competition and regulation. Areas of focus for the Committee shall include the Company's policies and other matters relating to the Company's investments, cash management and foreign exchange management, major financial risk exposures, the adequacy and effectiveness of the Company's information security policies and practices and the internal controls regarding information security, and the steps taken by management to monitor and mitigate or otherwise control these exposures and to identify future risks. The Committee will review and discuss with management the adequacy of

the Company's insurance programs, including director and officer insurance, product liability insurance and general liability insurance.

14. **Internal Auditors**. If an internal audit function is established and becomes operational, the Committee will review the audit plan of the Company's internal audit team and discuss with that team the adequacy and effectiveness of the Company's scope, staffing, and general audit approach. The Committee will review any significant reports prepared by the Company's internal auditors, as well as management's response. The head of the internal auditors will also report to and be evaluated by the Committee.

15. **Internal Control over Financial Reporting; Disclosure Controls**. The Committee will confer with management and the Auditors concerning the scope, design, adequacy and effectiveness of internal control over financial reporting and the Company's disclosure controls and procedures. The Committee will review reports on significant findings and recommendations with respect to internal control over financial reporting, together with management responses and any special audit steps adopted in light of any material control deficiencies.

16. **Correspondence with Regulators.** The Committee will consider and review with management, the Auditors, and outside advisors or accountants any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

17. **Internal Control Report.** At least annually (if required by applicable stock exchange listing requirements) or as may otherwise be determined by the Committee, the Committee will review a report by the Auditors describing its internal quality-control procedures and any material issues raised by (a) that firm's internal quality-control review, (b) any peer review of the firm's internal quality-control procedures or review, or (c) any inquiry or investigation by governmental or professional authorities conducted in the last five years of any audit performed by the Auditors.

18. **Complaint Procedures.** The Committee will oversee procedures for receiving, retaining and investigating the following:

    - complaints received by the Company regarding accounting, internal accounting controls, or auditing matters; and

    - confidential and anonymous submissions by employees concerning questionable accounting or auditing matters.

    In addition, the Committee will oversee procedures for receiving, retaining and investigating any "hotline" complaints or submissions delegated to the Committee by the Board.

> 19. **Ethical Compliance.** The Committee will review the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure compliance with applicable laws and stock exchange listing requirements, including the Company's Code of Business Conduct and Ethics ("***Code***"). The Committee will consider any request by directors or executive officers of the Company for a waiver from the Code. Any approved waivers shall be promptly disclosed as required by applicable law and stock exchange listing requirements.
>
> 20. **Related Party Transactions.** The Committee will review and approve, in accordance with the Company's policies, any related party transaction as defined by applicable law or stock exchange listing requirements.
>
> * * *
>
> 23. **Other Legal and Finance Matters**. The Committee will review with management legal and regulatory compliance and any actual, pending or threatened legal or financial matters that could significantly affect the Company's business or financial statements or as otherwise deemed appropriate by the Committee.

84. In violation of the Audit Committee Charter, Defendants Barris, Belcher, and Frederick conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, Defendants Barris, Belcher, and Frederick failed to maintain the accuracy of Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

85. Tempus is a healthcare-based technology company which focuses on the field of

precision medicine and intelligent diagnostics. The Company's intelligent diagnostics services purport to provide a unique blend of a patient's personal clinical data with laboratory results.

86. To support these endeavors, Tempus created the Tempus Platform, which features both a technology platform for free healthcare data and an operating system. The Company claims to have created one of the world's largest clinical and molecular oncology databases. As such, Tempus functions as one of the preeminent sequencers of cancer patients in the United States.

87. The Tempus Platform utilizes proprietary software and boasts a network of roughly 700 unique data connections derived from approximately 3,000 healthcare institutions. Moreover, the Company has developed multiple products based on the Tempus Platform, under the following three product lines: Genomics, Data and Services, and AI Applications (also known as Algos).

88. The Genomics product line offers next generation sequencing diagnostics, polymerase chain reaction profiling, and other anatomic and molecular pathology tests. The Genomics product line is offered to healthcare providers, researchers, life sciences companies, and other third parties. The Data and Services product line primarily services life sciences companies in the context of drug discovery and development.

89. The Data product line licenses de-identified data libraries through its "Insights" product and provides clinical trial support through its "Trial" product. The AI Applications product line primarily offers algorithmic diagnostics and the implementation of such software in the medical context.

90. The use of AI is purportedly central to the Company's business strategy, and to that effect the Company has stated one its primary goals is "to embed AI, including generative AI, throughout every aspect of diagnostics to enable physicians and researchers to make personalized, data-driven decisions that improve patient care."

91. Among the Company's most utilized financial metrics is Total Contract Value and/or Total Remaining Contract Value ("TCV"). TCV is intended to "represent[] the total revenue that a company expects to receive from a contract over its entire duration."[1] Moreover, TCV assumes all discretionary opt-ins, the exercise of all contract options, and the absence of early contract termination. Notably, Remaining TCV excludes any recognized revenue to date on such contracts as well as any future adjustments to the contracts.

***Tempus' Relationship with AstraZeneca Pathos AI***

92. As early as 2021, the global pharmaceutical company AstraZeneca engaged the Company about its Data and Services business. Under the Master Services Agreement (the "MSA"), the Company provides AstraZeneca with sequencing, licensed data, and related services at a discounted rate. In exchange, AstraZeneca originally committed to spending a minimum of $200 million during the five-year term period of the MSA. Through an amendment to the MSA, this commitment was raised to $220 million and the term period of the MSA extended to seven years.

93. During the Relevant Period, the Company engaged in an expansion of its contract with its long-term customer AstraZeneca. More specifically, the Company engaged in a joint venture with AstraZeneca and Pathos AI, in which the Company's de-identified oncology data model would be shared amongst the three companies. The expanded agreement included a $35 million payment from AstraZeneca to Tempus.

94. Notably, as per the expanded agreement between AstraZeneca and Tempus, the Company was contractually obligated to pay $35 million to Pathos AI.

[1] *Total Contract Value (TCV)*, ABACUM, https://www.abacum.ai/glossary/total-contract-value-tcv (last visited Aug. 6, 2025).

95. Pathos AI is a drug development company which heavily utilizes AI and was co-founded by Defendant Lefkofsky. Defendant Lefkofsky also serves as Pathos AI's Executive Chairman of the Board of Directors.

***Tempus' Other Relevant Business Ventures***

96. In May 2024, the Company entered into a joint venture with SoftBank which closed on July 18, 2024. According to the terms of the joint venture, the Company would perform the same business activities it conducted in the United States (i.e. sequencing, patient data organization, etc.), in Japan. Both Softbank and Tempus contributed $95.2 million to the joint venture, which formed SB Tempus Corp.

97. In February 2025, the Company closed its acquisition of Ambry, a leading genetic testing company. The consideration for Ambry consisted of $375.0 million in cash and an aggregate of 4,843,136 shares of the Company's Class A common stock. As a result of the acquisition, Ambry was folded into Tempus' Genomics division. Notably, the Company and Ambry possessed a close business relationship as far back as nine years before the start of the Relevant Period.

**False and Misleading Statements**

***August 6, 2024 Press Release***

98. On August 6, 2024, the Company issued a press release to announce its financial and operational results for the second quarter of 2024 ended June 30, 2024, which it also filed on Form 8-K with the SEC (the "Q2 2024 Press Release"). The Form 8-K was signed by Defendant Rogers.

99. The Q2 2024 Press Release stated, *inter alia*, that "[r]evenue increased 25% year-over-year to $166.0 million in the second quarter of 2024," that "[d]ata licensing revenue growth

accelerated to 40% year-over-year[,]" and that the Company "[e]stablished a joint venture with Softbank to enter the Japanese market."

100. In addition, the Q2 2024 Press Release included the following table concerning the Company's Data and Services financial results:

***Data and Services Gross Profit & Gross Margin***

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2024 | 2023 | 2024 | 2023 |
| Data and services revenue | $ 53,645 | $ 40,493 | $ 96,896 | $ 74,059 |
| Cost of revenues, data and services | 22,132 | 13,807 | 37,420 | 25,200 |
| Gross profit, data and services | $ 31,513 | $ 26,686 | $ 59,476 | $ 48,859 |
| Stock-based compensation expense | 7,229 | — | 7,229 | — |
| Employer payroll tax related to stock-based compensation | 119 | — | 119 | — |
| Non-GAAP gross profit, data and services | $ 38,861 | $ 26,686 | $ 66,824 | $ 48,859 |
| Gross margin, data and services | 58.7% | 65.9% | 61.4% | 66.0% |
| Stock-based compensation expense | 13.5% | 0.0% | 7.5% | 0.0% |
| Employer payroll tax related to stock-based compensation | 0.2% | 0.0% | 0.1% | 0.0% |
| Non-GAAP gross margin, data and services | 72.4% | 65.9% | 69.0% | 66.0% |

***August 6, 2024 Form 10-Q***

101. That same day, the Company filed its quarterly report on Form 10-Q with the SEC to report its financial and operational results for the period ended June 30, 2024 (the "Q2 2024 10-Q"), which was signed by Defendants Lefkofsky and Rogers. Attached to the Q2 2024 10-Q were certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Lefkofsky and Rogers attesting to the accuracy of the Q2 2024 10-Q and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

102. In the Q2 2024 10-Q, the Company reported the completion of its joint venture agreement with SoftBank, in which the Company would expand its business operations in Japan. The Q2 2024 10-Q stated, in relevant part:

> On May 18, 2024, the Company entered into a Joint Venture Agreement (the "Joint Venture Agreement"), by and among SoftBank Group Corporation ("SoftBank"), SoftBank Group Japan Corporation, the Company and Pegasos Corp. (the "Joint Venture"), pursuant to which the Joint Venture will engage in certain business activities in Japan similar to those conducted by the Company in the United States, including performing clinical sequencing, organizing patient data, and building a real world data business in Japan. The Joint Venture closed on July 18, 2024. ***The Company and SoftBank capitalized the Joint Venture with ¥30,000,000,000 (approximately $191.1 million based on foreign exchange rates as of July 18, 2024), split evenly between the two parties and each received 50% of the Joint Venture's outstanding capital stock and board seats.***
>
> In connection with entering into the Joint Venture Agreement, the Company entered into the following agreements with the Joint Venture: a Data License Agreement (the "Data License Agreement"), which became effective immediately upon signing the Joint Venture Agreement; an Intellectual Property License Agreement (the "IP License Agreement") and a Services Agreement, each of which became effective on July 18, 2024 upon closing. Under the Data License Agreement, the Company granted the Joint Venture a limited, non-exclusive, transferable license with a limited right to sublicense certain de-identified data for certain specified uses solely in Japan. ***Under the Data License Agreement, the Joint Venture paid the Company ¥7,500,000,000 (approximately $47.8 million based on foreign exchange rates as of July 18, 2024) in exchange for the license to the Initial Records Batch (as defined in the Data License Agreement) and an additional ¥7,500,000,000 (approximately $47.8 million based on foreign exchange rates as of July 18, 2024) pursuant to the IP License Agreement in exchange for a non-exclusive license with respect to certain of the Company's technologies for certain specified uses solely in Japan.*** Under the Services Agreement, the Company will provide the Joint Venture with certain services.
>
> The foreign exchange gain/loss on the exchange of funds on July 18, 2024 upon closing of the Joint Venture was not material. [2]

***August 6, 2024 Overview Letter***

103. Also on August 6, 2024, the Company issued an overview letter concerning its financial and operational results for the second quarter of 2024 (the "Q2 2024 Overview Letter"). The purpose of the Q2 2024 Overview Letter was to provide investors with "a summary of our financial and operating results, along with some context as to how we view those results, as it relates to both the near and long term."

[2] Unless otherwise stated, all emphasis is added.

104. Concerning the Company's Data and Services business, the Q2 2024 Overview Letter stated:

> Data
>
> Our Data and Services business experienced accelerated growth in the quarter, delivering $53.6 million in revenue versus $40.5 million in Q2 2023, up 32.5% year-over-year, largely driven by our Insights business (Data Licensing), which not only grew faster than our Services business (Clinical Trials), but also had higher Non-GAAP gross margin of 72.4% for the quarter. ***We ended the quarter with >$900 million in total remaining contract value, which highlights the continued adoption and progress of our Data and Services offerings. Most of these contracts are multiyear, with total remaining contract value representing data and services that will be provided over the remaining term of each contract.***
>
> Notably, we signed an agreement with Novartis to expand the amount of data we license them which we expect to deliver throughout 2024, we signed a five year agreement with Takeda which was a significant expansion in size and scope to our existing agreement, we renewed our agreement with Astellas adding two more committed years to their data license, and we signed a large study with United Therapeutics to work on pulmonary hypertension models. All were big wins in the quarter for our Data & Services business, so we're excited to see the momentum continue.

***August 6, 2024 Earnings Call***

105. Also on August 6, 2024, the Company hosted an earnings call to discuss its financial and operational results for the second quarter of 2024 (the "Q2 2024 Earnings Call").

106. During the Q2 2024 Earnings Call, an analyst from TD Cowen (Research) requested further elaboration on the Company's selection of deals in its TCV figure. Defendant Lefkofsky responded by stating the following:

> Yes. I mean we obviously didn't include numbers for a variety of reasons, not the least of which we're sensitive to -- that we've got partners and those things. There are times that they're appropriate. Times, they're not. ***These are all good-sized deals for us***. They're - - I think what we represented in the quarter is that we had multiple large pharma companies, and we didn't list all the smaller biotechs that we also signed various agreements with -- but we had kind of four larger pharma companies that all did significant deals in the quarter. And for us, it was just a sign of both in terms of the revenue we delivered in our Insights business and the bookings we delivered Q2 was a really strong data licensing quarter, and that was good to see. We expected to see if it was good to see, and we expect that momentum to continue

> at least in the foreseeable future. ***But we don't really comment on the size of these deals unless they get so big that we kind of have effectively no choice. And these deals were really good size deals, but they weren't $300 million deals where we would be talking about it.***

107. Defendant Rogers also responded to the TD Cowen analyst's question by stating:

> ***And I would also add that the total remaining contract value is still north of $900 million.*** So again, as Eric pointed out, we delivered a lot of revenue, but obviously, ad bookings that kind of refilled that total remaining contract value. In the other metric, which we present annually, is net revenue retention, but these are again the highlighting ones that we had agreements in place, and we're able to expand those in subsequent years. So we're excited about all the agreements that were mentioned in the release.

108. Defendant Lefkofsky further added:

> Yes. It's really -- another -- just to jump on Jim's comment, as one of the most exciting things about the Astellas indicated arrangements in addition to Novartis', these are people that had multiyear agreements and re-up for larger agreements or we up for larger periods of time. And so that's what you want to see -- Tempus is only eight years old, right? We've been licensing data for five or six years. ***So what you want -- and which means that most of these -- most of our clients have only been clients for two or three years on the data side. So seeing big renewals occur over and over again is a really good sign that we're adding a ton of value, and that value is resonating with our clients.***

109. Also during the Q2 2024 Earnings Call, an analyst from Stifel, Nicolaus & Company ("Stifel") asked a question pertaining to the Company's TCV metric. More specifically, the Stifel analyst asked for an explanation as to the Company's confidence in its $900 million TCV figure when $300 million of its revenue was derived from clients which had not officially renewed their contracts. Defendant Lefkofsky replied by stating:

> Yes. I mean, they've actually -- both contracts have work actually already been extended in terms of timing. So I think in one of the amendments, we add another year, I think, to AstraZeneca, something like that. And we have a longer duration now going out with GSK as well. So we have -- we've got, I don't know the exact dates, but I'll say roughly 2027, '28, summer of '27, '28. So these contracts go kind of years in the future, ***so there's no immediate clips coming up, and we feel good about all of our larger deals in terms of the value that we're delivering, and we would suspect that the vast majority of all our big deals renew and hopefully expand.***

***November 4, 2024 Press Release***

110. On November 4, 2024, the Company issued the Q3 2024 Press Release, which it also filed on Form 8-K with the SEC. The Form 8-K accompanying the Q3 2024 Press Release was signed by Defendant Rogers. The Q3 2024 Press Release reported that the Company had entered into an agreement with Ambry, a genetic testing company, and quoted Defendant Lefkofsky as stating, in relevant part, "Ambry is uniquely positioned given that its revenues are currently growing at north of 25% a year and it generates meaningful EBITDA and cash flow."

111. Moreover, the Q3 2024 Press Release reported that "[r]evenue increased 33.0% year-over-year to $180.9 million in the third quarter of 2024," and that "Non-GAAP Data and services gross margin was 78.3% in the third quarter of 2024, compared to 60.5% in the third quarter of 2023, led by Insights, or data licensing revenue, which grew 86.6% year over year."

112. In addition, the Q3 2024 Press Release included the following table concerning the financial results of the Company's Data and Services business:

***Data and Services Gross Profit & Gross Margin***

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | **2024** | **2023** | **2024** | **2023** |
| Data and services revenue | $ 64,507 | $ 39,242 | $ 161,403 | 113,301 |
| Cost of revenues, data and services | 14,964 | 15,490 | 52,384 | 40,690 |
| Gross profit, data and services | $ 49,543 | $ 23,752 | $ 109,019 | 72,611 |
| Stock-based compensation expense | 916 | — | 8,145 | — |
| Employer payroll tax related to stock-based compensation | 43 | — | | — |
| Non-GAAP gross profit, data and services | $ 50,502 | $ 23,752 | $ 117,326 | $ 72,611 |
| Gross margin, data and services | 76.8 % | 60.5 % | 67.5 % | 64.1 % |
| Stock-based compensation expense | 1.4 % | 0.0 % | 5.0 % | 0.0 % |
| Employer payroll tax related to stock-based compensation | 0.1 % | 0.0 % | 0.1 % | 0.0 % |
| Non-GAAP gross margin, data and services | 78.3 % | 60.5 % | 72.7 % | 64.1 % |

***November 4, 2024 Overview Letter***

113. That same day, the Company issued an overview letter concerning its financial and operational results for the third quarter of 2024 (the "Q3 2024 Overview Letter"). The purpose of the Q3 2024 Overview Letter was to provide investors with "a summary of our financial and operating results, along with some context as to how we view those results, as it relates to both the near and long term."

114. Concerning the Company's TCV metric and its acquisition of Ambry, the Q3 2024 Overview Letter stated the following:

> Data Our Data and Services business experienced accelerated growth in the quarter, delivering $64.5 million in revenue versus $39.2 million in Q3 2023, up 64.4% year-over-year, largely driven by our Insights business (Data Licensing), which not only grew faster than our Services business (Clinical Trials), but also had higher Non-GAAP gross margin of 84.0% for the quarter. ***We ended the quarter with >$900 million in total remaining contract value.***
>
> ***
>
> ***First, we don't take large acquisitions lightly; we actually have a bias against them.*** Over the past 9 years we have come to know and admire a few companies in our space - Ambry is one of them.
>
> ***We've been able to watch them grow and mature as a business. Over the past few years, their hereditary cancer portfolio has become best in class, which has led to their recent acceleration of revenues and market share gains.*** In addition, their product line is uniquely situated to allow for our expansion into rare disorders, pediatrics, cardiology, and other areas. Finally, their focus on scale and efficiency allowed them to achieve something that is very rare in our space – a genomics business with revenues growing at more than 25% that is also generating positive adjusted EBITDA and free cash flow. Upon closing the transaction, we too expect to join this club going forward on a consolidated annual basis.

***November 4, 2024 Earnings Call***

115. Also on November 4, 2024, the Company hosted an earnings call to discuss its financial and operational results for the third quarter of 2024 with investors (the "Q3 2024 Earnings Call").

116. During the Q3 2024 Earnings Call, an analyst from Morgan Stanley asked a question regarding the purported sustainability of Ambry's 25% growth in light of the uneven growth of its competitors. In response, Defendant Lefkofsky stated:

> [W]e have always felt it's important to be in hereditary screening. It's important to be in somatic and liquid testing for therapy selection. It's important to be an MRD and monitoring. So this fits kind of squarely within our strategic plans and current activities. Beyond that, ***the business has actually been accelerating their growth rate.*** And if you look at the landscape, we believe the hereditary market is quite stable, more and more insights are relevant to inherited cancer risk understanding. ***And so there are certainly growth in that space. Ambry, in particular, seems to be taking market share from others. We don't see any signs that that's going to slowdown and even though the law of big numbers does tend to bring down growth rates, which is true for us and will be true for them, we think that it will be a meaningful grower for some period of time.***
>
> ***And there's nothing that we saw in the past year where we really dug into the business deeply that led us to think there was some kind of systemic slowdown. So we think the business will perform well, it will grow. It will make more money and it fits squarely within our footprint.***

117. Also during the Q3 2024 Earnings Call, an analyst from TD Cowen asked whether the Ambry deal was competitive in nature, under the assumption that the deal was not. Defendant Lefkofsky responded:

> ***So in terms of a competitive process, Ambry did run a competitive process.*** They – the – I think, hired banks and looked at their options. You'd have to kind of dig in – there are public companies, so you can kind of dig into some of their historic comments. But –and I'm not an expert on Konica Minolta, but I know at one point, they had Ambry plus another business that were bolted together. I think for a period of time, they were looking to sell both and then decided to split it out. ***So it was a process, but it was a process with twists and turns. We were fortunate that we knew the business well. We were watching it closely. We were interacting with them as a partner and we were able to kind of watch their performance over long horizons of time to really get comfortable that this business was durable***, that the economics were going to – we're improving and that we thought this was going to be a highly synergistic asset for us to acquire under the right terms and in a way that it accelerates our business both in terms of the products we take to market and our journey to get to EBITDA and cash flow positive, which we know are.

118. Later on during the Q3 2024 Earnings Call, an analyst from William Blair & Co. requested further explanation as to how the Company's deal with Ambry further develops its health system relationships. Defendant Lefkofsky responded by stating:

> So I think in terms of the relationships that Ambry has on the payer side, they obviously are primarily an in-network lab. We're primarily out of network lab. So in some of those discussions, they've got a lot of history in dealing with the commercial payers. And then on the health system side, as I mentioned before, they're primary call point is genetic counselors or we're primarily dealing with oncologists. ***So again, just deepening those relationships with across kind of the entire ecosystem on the provider side, we believe we'll kind of strengthen our position with the hospitals.***

119. Also during the Q3 2024 Earnings Call, an analyst from Morgan Stanley asked for further elaboration concerning the Company's TCV figure, and more specifically, whether the metric grew sequentially and in the proper direction. Defendant Rogers responded:

> So as we noted at the end of Q2, it was north of $900 million, still north of $900 million at the end of Q3. We obviously recognize a lot of revenue in Q3 from the number that was there at Q2. So again, ***we continue to refill the bucket and we think that at that level of north of $900 million obviously gives us very good forward-looking visibility into the next several years of data licensing***.
>
> In terms of the step-up in Q4, Q4 is historically our largest quarter from a data perspective. Oftentimes, we have projects to kind of follow pharma cycling budgets and so -- our budgeting cycles. And so this is not atypical for us to have a step-up in Q4 on the data licensing side.

***February 24, 2025 Press Release***

120. On February 24, 2025, the Company issued a Press Release to announce its financial and operational results for the fourth quarter and full year 2024, ended December 31, 2024 (the "Q4 2024 Press Release"). The Company also filed the Q4 2024 Press Release on Form 8-K with the SEC that same day, which was signed by Defendant Rogers.

121. The Q4 2024 Press Release noted that the Company had closed its deal to acquire Ambry Genetics and that it "[e]nded the year with $940 million in Total Remaining Contract Value and 140% net revenue retention[.]"

122. In addition, the Q4 2024 Press Release also included the following table concerning the financial results of the Company's Data and Services business:

***Data and Services Gross Profit & Gross Margin***

| | Three Months Ended December 31, | | Year Ended December 31, | |
|---|---|---|---|---|
| | 2024 | 2023 | 2024 | 2023 |
| Data and services revenue | $ 80,246 | $ 55,499 | $ 241,649 | $ 168,800 |
| Cost of revenues, data and services | 16,434 | 15,792 | 68,818 | 56,482 |
| Gross profit, data and services | $ 63,812 | $ 39,707 | $ 172,831 | $ 112,318 |
| Stock-based compensation expense | 385 | — | 8,530 | — |
| Employer payroll tax related to stock-based compensation | 202 | — | 364 | — |
| Non-GAAP gross profit, data and services | $ 64,399 | $ 39,707 | $ 181,725 | $ 112,318 |
| Gross margin, data and services | 79.5 % | 71.5 % | 71.5 % | 66.5 % |
| Stock-based compensation expense | 0.5 % | 0.0 % | 3.5 % | 0.0 % |
| Employer payroll tax related to stock-based compensation | 0.3 % | 0.0 % | 0.2 % | 0.0 % |
| Non-GAAP gross margin, data and services | 80.3 % | 71.5 % | 75.2 % | 66.5 % |

***February 24, 2025 Overview Letter***

123. Also on February 24, 2025, the Company issued an overview letter concerning its financial and operational results for the fourth quarter of 2024 (the "Q4 2024 Overview Letter"). The purpose of the Q4 2024 Overview Letter was to provide investors with "a summary of our financial and operating results, along with some context as to how we view those results, as it relates to both the near and long term."

124. Regarding the Company's TCV metric and its integration of Ambry, the Q4 2024 Overview Letter stated the following:

> In the quarter, we signed a large data agreement with Boehringer Ingelheim, who is using our data for biomarker development and novel discovery efforts, and with Illumina, who is using our data to improve aspects of their research and development. Finally, we had a pick-up in the quarter, related to the accounting treatment of AstraZeneca's warrant expiring - we had been discounting the data we were providing to AstraZeneca and when the warrant lapsed, the discount lapsed with it, allowing us to recapture the discount we had been accruing. We also had a large data delivery of near similar size that we expected to go out in Q4 slip into early 2025.

> So all in, with put and takes, our data business continues to hum along; performing well throughout the year. ***Not only did we sign agreements with Novartis, BioNTech, Merck EMD, Takeda, Astellas, Illumina, and United Therapeutics, we ended the quarter with >$940 million in total remaining contract value, an increase from Q3 and year end 2023. Given our size, ending the year with a higher total remaining contract value than when we started is a clear indication that our data products are resonating.*** It's also the reason our net revenue retention skyrocketed to 140% in 2024. While we are incredibly proud that our clients on average spent 40% more with us than they did the year before, we recognize this statistic is likely to come down over time, as anything north of 100% is a win.
>
> ***
>
> As it relates to Ambry's full year 2024 results, their revenues in 2024 were $315 million, representing approximately 30% growth year-over-year. It's worth noting that Ambry benefited in 2024 from improved reimbursement and volume tailwinds related to some of its competitors that drove enhanced growth in 2024. Their Non-GAAP gross margin was 66.8% in 2024 and their Adjusted EBITDA was $51.0 million.

***February 24, 2025 Earnings Call***

125. Also on February 24, 2025, the Company hosted an earnings call to discuss its financial and operational results for the fourth quarter and full year 2024 with investors (the "Q4 2024 Earnings Call").

126. During the Q4 2024 Earnings Call, an analyst from Bank of America requested further explanation as to how investors should prospectively consider the Company's purported $940 million in TCV. Defendant Rogers stated the following in response:

> I'd say the number did grow higher throughout the course of the year. And we also kind of grew — the amount of revenue that came out of that was at a record level as well. And so any growth in that number when you're kind of achieving kind of the revenue growth that we saw you'd be very happy with. The way that we kind of view the total remaining contract value is it at a healthy enough level to kind of give you some visibility into the next several years of revenue. And at the level that it's at given the amount of revenue that we recognize in a given year, it provides that level of visibility. As we've previously kind of talked about when we get kind of larger deals then that can result in some fluctuation of those.

> And you don't sign kind of very large deals every single quarter. We highlighted some of the larger deals that we signed in the quarter with BI and Illumina. And again we think that it's at a very healthy level for us to achieve the targets that we're looking to achieve.

127. Defendant Lefkofsky added to Defendant Roger's answer by stating:

> Yeah. And ***the punch line is, its lumpy, right***? So the fact that it's growing and the fact that it — and the fact that our net revenue retention is so high means the core business is really, really strong, right? I mean in simple terms if you've got about $1 billion of total contract value and you've delivered $250 million in a year to have the number grow you had to basically sign more than that. So that's awesome. But yes, I mean in a perfect world you'd like it to grow by your growth rate. So if you think of it like, yeah, we had — if it doesn't — if our growth rate is such that you have to basically sign all the data you delivered plus another let's say whatever 30% then maybe you'd want it to grow by $75 million.

128. Later on during the Q4 2024 Earnings Call, an analyst from Stifel asked whether there was any shift in confidence or the existing terms concerning contract renewals for AstraZeneca and GlaxoSmithKline (totaling $300 million). Defendant Rogers responded:

> So just a reminder, though, that kind of $300 million of opt-ins that we've highlighted in the total remaining contract value are kind of the last 18 months or so of the AstraZeneca and GSK agreements. ***There's no updates. We're still several years away from kind of hitting those renewals and kind of no change in our confidence in terms of them don't renew.***

129. Defendant Lefkofsky added that "[t]he range of those renewals is like 2027 to 2029. ***So we're still years away***."

***April 7, 2025 Proxy Statement***

130. On April 7, 2025, the Company filed the 2025 Proxy Statement with the SEC. The 2025 Proxy Statement was solicited by Defendants Lefkofsky, Barris, Belcher, Doudna, Epstein, Frederick, Gottlieb, Leonsis, and West, pursuant to Section 14(a) of the Exchange Act, and contained materially false and misleading statements.

131. The 2025 Proxy Statement solicited shareholders to vote to, *inter alia*: (1) re-elect Defendants Lefkofsky, Barris, Belcher, Doudna, Epstein, Frederick, Gottlieb, Leonsis, and West

to serve as directors until the next annual meeting of stockholders; (2) ratify the appointment by the Audit Committee of the Board of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ended December 31, 2025; and (3) approve the reincorporation of the Company from the State of Delaware to the State of Nevada by conversion.

132. With respect to the Code of Conduct, the 2025 Proxy Statement stated:

> We have adopted a Code of Conduct, which is applicable to our employees, officers, directors and anyone conducting business on our behalf, such as contractors, consultants and suppliers. The Code of Conduct provides a framework for sound ethical business decisions and sets forth our expectations on a number of topics, including conflicts of interest, compliance with laws, use of our assets and business ethics. Our Code of Business Conduct is posted on the "Governance Documents" section of our website located at https://investors.tempus.com/. If the Company ever were to amend or waive any provision of its Code of Business Conduct that applies to the Company's principal executive officer, principal financial officer, principal accounting officer or any person performing similar functions, the Company intends to satisfy its disclosure obligations, if any, with respect to any such waiver or amendment by posting such information on its website set forth above rather than by filing a Current Report on Form 8-K. In the case of a waiver for an executive officer or a director, the disclosure required under applicable Nasdaq listing standards also will be made available on our website.

133. In a section titled "Board's Role in Risk Oversight," the 2025 Proxy Statement stated, in relevant part:

> ***Board's Role in Risk Oversight***
>
> While senior management has primary responsibility for managing risk, the Board has responsibility for risk oversight with specific risk areas delegated to relevant Board committees who report on their deliberations to the full Board. The specific risk areas of focus for the Board and each of its committees are summarized below.
>
> **Full Board**
>
> • Oversee the Company's risk governance framework, including an enterprise-wide culture that supports appropriate risk awareness and the identification, escalation, and appropriate management of risk, including cybersecurity risk;

- Establish and oversee processes to maintain the Company's integrity; and
- Review, approve, and monitor fundamental financial and business strategies and significant corporate actions

134. The 2025 Proxy Statement was materially misleading because it failed to disclose, *inter alia*, that contrary to the 2025 Proxy Statement's descriptions of the Board's risk oversight function, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements to the investing public.

135. The 2025 Proxy Statement also failed to disclose, *inter alia*, that: (1) a substantial number of the Company's contractual agreements were with related parties, self-funded, or otherwise included non-binding opt-ins; (2) as a result of the foregoing, the Company's contractual agreements were neither as assured nor as profitable as previously disclosed to investors; (3) Tempus' joint venture with SoftBank carried undertones of "round-tripping" capital to generate revenue for the Company; (4) as a result of these undertones, Tempus' joint venture was neither as credibly nor as substantive as previously disclosed to investors; (5) Tempus' acquisition of Ambry generated substantial risk to the Company given Ambry's ethically questionable billing practices; (6) AstraZeneca engaged in a "pass-through payment" through a joint agreement with itself, the Company, and Pathos AI; (7) as a result of AstraZeneca's pass-through payment, its financial commitments to Tempus were significantly reduced; and (8) the Company failed to maintain internal controls. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

136. As a result of the material misstatements and omissions contained in the 2025 Proxy Statement, Company shareholders voted to: (1) reelect Defendants Lefkofsky, Barris, Belcher, Doudna, Epstein, Frederick, Gottlieb, Leonsis, and West to the Board, thereby allowing

them to continue to breach their fiduciary duties to Tempus; (2) ratify the appointment by the Audit Committee of the Board of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ended December 31, 2025; and (3) approve the reincorporation of the Company from the State of Delaware to the State of Nevada by conversion.

***April 23, 2025 Press Release***

137. On April 23, 2025, the Company issued a press release (the "Pathos Press Release") to announce its "expanded" agreements with AstraZeneca and Pathos (the "Pathos Agreement").

138. The Pathos Press Release stated, in relevant part:

> Tempus AI, Inc. (NASDAQ: TEM), a technology company leading the adoption of AI to advance precision medicine and patient care, today announced multi-year, strategic collaborations with AstraZeneca (LSE/STO/Nasdaq: AZN) and Pathos AI, Inc., in which the companies will work together to build a multimodal foundation model in oncology which can be used to gather biological and clinical insights, discover novel drug targets, and develop therapeutics for the broader oncology community.
>
> Tempus' de-identified oncology data will be used to build the foundation model. Upon completion, the model will be shared among all three parties to advance their individual efforts to improve patient care. The agreements include $200 million in data licensing and model development fees to Tempus.
>
> ***The agreement with AstraZeneca expands on the strategic partnership between the two companies announced in 2021*** and aims to leverage Tempus' AI-enabled platform and vast repository of multimodal data to advance novel therapeutic programs in oncology on a global scale.

***May 6, 2025 Press Release***

139. On May 6, 2025, the Company issued a press release to announce its financial and operational results for the first quarter of 2024 ended March 31, 2025, which it also filed on Form 8-K with the SEC (the "Q1 2025 Press Release"). The Form 8-K was signed by Defendant Rogers.

140. The Q1 2025 Press Release reported that the Pathos Agreement as "resulting in $200 million in data licensing and model development fees over the next 3 years," and that the

Company increased "full year 2025 revenue guidance to $1.25 billion," and to "expect positive Adjusted EBITDA of $5 million for full year 2025."

141. In addition, the Q1 2025 Press Release included the following table concerning the financial results of the Company's Data and Services business:

***Data and Services Gross Profit & Gross Margin***

| | Three Months Ended March 31, | |
|---|---|---|
| | 2025 | 2024 |
| Data and services revenue | $ 61,933 | $ 43,251 |
| Cost of revenues, data and services | 15,751 | 15,288 |
| Gross profit, data and services | $ 46,182 | $ 27,963 |
| Stock-based compensation expense | 611 | — |
| Employer payroll tax related to stock-based compensation | 44 | — |
| Non-GAAP gross profit, data and services | $ 46,837 | $ 27,963 |
| Gross margin, data and services | 74.6 % | 64.7 % |
| Stock-based compensation expense | 1.0 % | 0.0 % |
| Employer payroll tax related to stock-based compensation | 0.1 % | 0.0 % |
| Non-GAAP gross margin, data and services | 75.6 % | 64.7 % |

***May 6, 2025 Overview Letter***

142. That same day, the Company issued an overview letter concerning its financial and operational results for the first quarter of 2025 (the "Q1 2025 Overview Letter"). The purpose of the Q1 2025 Overview Letter was to provide investors with "a summary of our financial and operating results, along with some context as to how we view those results, as it relates to both the near and long term."

143. Regarding the Company's TCV metric and the Pathos Agreement, the Q1 2025 Overview Letter stated the following:

> We ***also announced our expanded collaboration with AstraZeneca*** and Pathos AI to build the first foundation model within oncology leveraging our data… [T]his agreement is exciting because we believe these types of models will have a tremendous impact on patient care. ***While not a contributor to Q1 revenues, it does increase our Total Remaining Contract Value by $200 million, resulting in a Total Remaining Contract Value as of April 30th in excess of $1 billion. Revenue associated with this agreement will be recognized over the three year term. Given***

> ***AstraZeneca is our longest standing data customer and our first strategic collaboration, we're very pleased that they have expanded our relationship in such a significant manner – further validating the value of our data for biopharma.*** It should also be noted that this deal does not impact our current licensing arrangement with AstraZeneca which remains intact and serves a different purpose. The data being licensed here can only be used to build a foundation model, whereas AstraZeneca's current data license is for files they can bring into their environment and use for both discovery and regulatory purposes.

***May 6, 2025 Earnings Call***

144. Also on May 6, 2025, the Company hosted an earnings call to discuss its financial and operational results for the first quarter of 2025 with investors (the "Q1 2025 Earnings Call").

145. During the Q1 2025 Earnings Call, Defendant Lefkofsky stated the following:

> So I would say, all in, the company is performing super well, which was in my quote. Revenues are up. Gross profit is up. Both are growing nicely. We're managing our costs, which is producing nice year-over-year operating leverage. In addition, I'll highlight just one other big piece of news, which we put out about a week ago, which is we announced a three-year $200 million data and modeling license agreement with AstraZeneca and Pathos in April to build the world's largest foundation model in oncology. This is big for a few reasons.
>
> ***One is it brings our total remaining contract value to greater than $1 billion as of April 30.*** It also allows us to take over 300 petabytes of data, which includes this really rich multimodal data set connected to outcomes, and use that to build a foundation model, which is -- in addition to the data licensing, which is quite positive for us. Also, the cost of compute is not small, and AZ and Pathos are covering a significant portion of that.
>
> When the model is complete, which we expect the first version of the model will be completed in about 9 to 12 months, each party will get a copy, AZ and Pathos to advance their drug discovery efforts and Tempus to advance its diagnostic and data products. ***Given that AstraZeneca is our longest-standing client, actually was our first strategic collaboration, we couldn't be more excited to be expanding our relationship in such a significant manner***, I think, kind of further validating the value we're providing to lots of biopharma clients.
>
> It's also worth noting this is a nonexclusive agreement. We can essentially license data and build models with others, and we hope to do so in the future. And as such, this represents an entirely new category for us.

146. Also during the Q1 2025 Earnings Call, an analyst from Morgan Stanley requested further elaboration as to the "complicated" Pathos Agreement, and how revenue would be recorded on the Company's profit and loss statement. In response, Defendant Lefkofsky stated:

> ***[T]his is $200 million of data licensing and real data revenue***.
>
> And so somebody's got to be willing to sign up for something that significant. And it's expensive. And so even though there's a ton of excitement, we have to turn that into tangible agreements and tangible projects and kick those off.
>
> In the case of AZ and Pathos, AstraZeneca was a client of ours. They also had spent some time with Pathos and got to know that team. I think there was -- independent of the Tempus relationship, they were exploring some different ideas together.
>
> And so I think when we began discussing this idea of building a foundation model, it made sense for them to want to have this be a three-way agreement, whereby they can make a sizable investment and commit some of the attributes they have, but they also could leverage a bunch of the work that Pathos had done and then obviously leverage our data and the work we had done. ***And so it came together as a three-way partnership but just as easily could have come together as a two-way partnership between us and the pharmaceutical company and not involve Pathos***.
>
> And I'll let Jim cover the rev rec.

147. Defendant Rogers added to Defendant Lefkofsky's answer by stating:

> Yes. In terms of the revenue recognition, I think the easiest way to think about it is we have a $200 million kind of data license to Pathos that is specifically related to building the foundational models. So the data can only be used for that purpose as AZ, Pathos and Tempus work together to build that foundational model. There are some cash flows between AZ to Tempus over to Pathos, but there's no revenue recognition impact of that. ***And so the $200 million will be recognized*** -- it ramps a little bit over the three-year period but roughly ratably over the three-year term, during which the model will be built.
>
> ***So this license is no different than the other -- the large subscriptions that we have.*** The upfront payment from Pathos to Tempus doesn't trigger any revenue recognition upon that payment. It's the three-year subscription similar to the other large multiyear deals that we currently have.

148. Also during the Q1 2025 Earnings Call, an analyst from TD Cowen requested that the Individual Defendants provide "any qualitative color" on the TCV metric as it pertained to AstraZeneca. Defendant Rogers responded by stating, in relevant part:

> [R]egarding the Insights business and the Data and Services business, it's also off to a good start. As we mentioned, the whole Data and Services business growing more than 40%, the Insight business growing 58%. So we were very fortunate coming into the year. ***We had $940 million of real contract value that was yet to be delivered.***
>
> And so delivering on those subscriptions and then adding additional deals in Q1, obviously, ***the highlight coming in, in April with [AstraZeneca], which pushes the total remaining contract value over $1 billion for the first time ever.*** And so that forward-looking visibility that those contracts provide allow us to feel really confident about the data number for the balance of the year and into the next several years.

149. The statements referenced in ¶¶ 98-129 and ¶¶ 137-148 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose that: (1) a substantial number of the Company's contractual agreements were with related parties, self-funded, or otherwise included non-binding opt-ins; (2) as a result of the foregoing, the Company's contractual agreements were neither as assured nor as profitable as previously disclosed to investors; (3) Tempus' joint venture with SoftBank carried undertones of "round-tripping" capital to generate revenue for the Company; (4) as a result of these undertones, Tempus' joint venture was neither as credibly nor as substantive as previously disclosed to investors; (5) Tempus' acquisition of Ambry generated substantial risk to the Company given Ambry's ethically questionable billing practices; (6) AstraZeneca engaged in a "pass-through payment" through a joint agreement with itself, the Company, and Pathos AI; (7) as a result of AstraZeneca's pass-through payment, its financial commitments to Tempus were significantly reduced; and (8) the Company failed to maintain internal controls. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

## The Truth Emerges

**May 28, 2025 Spruce Point Report**

150. On May 28, 2025, the investment management firm Spruce Point released the Spruce Point Report. The Spruce Point Report observed the following issues with Tempus and its operations: (a) Defendant Lefkofsky and others he affiliates with have a history of cashing out of companies before public shareholders begin to incur losses; (b) the Company's AI abilities were overstated considering its AI applications were generating minimal revenue; (c) multiple executives and members of the Board (namely Defendants Belcher, Barris, and Leonsis) have been affiliated with companies that have been troubled and also previously restated financial results; (d) the Company's accounting and financial reporting appeared aggressive; (e) the AstraZeneca and Pathos AI deals required greater scrutiny; and (f) the Company had recently revised its financial guidance in a way that showed weakness at its core

151. The Spruce Point Report asserted that the Company overstated its reported TCV figure of over $1 billion near the end of the Relevant Period by roughly $600 million. The Spruce Point Report stated that "the TCV that Tempus reports is aggressively defined with non-binding opt-ins, improbable milestone payments, related-party transactions, and self-funded commitments."

152. The Spruce Point Report went on to explain how, "[c]ontrary to the Company's messaging, this latest deal with Pathos is not a true extension of the AstraZeneca relationship, but rather a restructuring that we believe underscores the ongoing erosion of the commitment between Tempus and AstraZeneca." The Spruce Point pointed out that the Pathos Agreement featured a $35 million "pass-through payment" in which AstraZeneca would pay Tempus and Tempus would subsequently pay Pathos AI. The Spruce Point Report argued that such a payment was incorrectly represented as revenue when, in fact, AstraZeneca was reducing its financial commitments to Tempus.

153. The Spruce Point Report further asserted that the Company's venture in SB Tempus Corp. utilized "aggressive financial engineering" which conveyed the appearance of the Company "round-tripping" capital to create revenue. The Spruce Point Report cited the fact that "the Company invests $95 million into the joint venture and then receives nearly the same amount back in the for of license payments." Moreover, the Spruce Point Report stated that Tempus recognizes such payments as revenue "and total contract value, potentially boosting its reported financial performance with funds that originated from its own investment."

154. Further, the Spruce Point Report claimed that "Ambry's rapid revenue growth is driven by aggressive use[] of the ambiguous billing code 81479." The Spruce Point Report also criticized Ambry because "routinely conducting concurrent DNA and RNA testing increases costs to patients and payors, possibly prioritizing revenue over clinical necessity."

155. On this news, the price per share of Tempus stock fell $12.67, or roughly 19.23%, from its closing price on May 27, 2025 of $65.87 per share to close on May 28, 2025 at $53.20 per share.

## DAMAGES TO TEMPUS

156. As a direct and proximate result of the Individual Defendants' conduct, Tempus will lose and expend many millions of dollars.

157. Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company; its CEO; and its CFO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

158. Such expenditures also include, but are not limited to, fees, costs, and any payments

for resolution of or to satisfy judgements associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

159. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

160. Additionally, these expenditures include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including lucrative insider trading conducted by six of the Individual Defendants.

161. As a direct and proximate result of the Individual Defendants' conduct, Tempus has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

162. Plaintiff brings this action derivatively and for the benefit of Tempus to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholder, directors, and/or officers of Tempus, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act, as well as the aiding and abetting thereof.

163. Tempus is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

164. Plaintiff is, and has been at all relevant times, a shareholder of Tempus. Plaintiff will adequately and fairly represent the interests of Tempus in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

165. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

166. A pre-suit demand on the Board of Tempus is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Defendants Lefkofsky, Barris, Belcher, Doudna, Epstein, Frederick, Gottlieb, Leonsis, and West (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to five of the nine Director-Defendants who are on the Board at the time this action is commenced.

167. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

168. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are

not disinterested, and demand upon them is futile, and thus excused.

169. The Director-Defendants knew of the falsity of the misleading statements at the time they were made. Risk management and compliance protocols are an integral part of the Company's business. The maintenance of risk management and compliance procedures was highly material to the Company's core operations, as evidenced by numerous references in the Company's public filings and press releases issued during the Relevant Period.

170. As Board members of Tempus, charged with overseeing the Company's affairs, the Director-Defendants all must have had knowledge of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Tempus, the Director-Defendants must have been aware of the material facts regarding the issues plaguing Tempus' risk management systems and compliance procedures.

171. Additional reasons that demand on Defendant Lefkofsky is futile follow. Defendant Lefkofsky is the Company's founder, CEO, Chairman of the Board, and has served as a Company director since August 2015. He also currently serves as a member of the Executive Committee. The Company provides Defendant Lefkofsky with his principal occupation, for which he receives handsome compensation for his role at the Company, as alleged above. Thus, as the Company admits, he is not independent. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Lefkofsky failed to correct, and personally made, the false and misleading statements in the earnings calls and press releases that are referenced herein. Furthermore, Defendant Lefkofsky signed the materially false and misleading Forms 10-Q and associated SOX certifications that are referenced

herein. He also solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and contributed to, *inter alia*, the re-election of himself and Defendants Barris, Belcher, Doudna, Epstein, Frederick, Gottlieb, Leonsis, and West to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Moreover, Defendant Lefkofsky has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein. Additionally, Defendant Lefkofsky is named as a Defendant in the Securities Class Action. For these reasons, Defendant Lefkofsky breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

172. Additional reasons that demand on Defendant Barris is futile follow. Defendant Barris has served as a Company director since September 2017. He also serves as the Chair of the Compensation Committee, as a member of the Audit Committee, and as a member of the Executive Committee. He has received and continues to receive handsome compensation for his role at the Company, as alleged above. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and contributed to, *inter alia*, the re-election of himself and Defendants Lefkofsky, Belcher, Doudna, Epstein, Frederick, Gottlieb, Leonsis, and West to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Barris breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

173. Additional reasons that demand on Defendant Belcher is futile follow. Defendant Belcher has served as a Company director since January 2019. He also serves as the Chair of the Audit Committee. He has received and continues to receive handsome compensation for his role at the Company, as alleged above. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and, *inter alia*, the re-election of himself and Defendants Lefkofsky, Barris, Doudna, Epstein, Frederick, Gottlieb, Leonsis, and West to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Belcher breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

174. Additional reasons that demand on Defendant Doudna is futile follow. Defendant Doudna has served as a Company director since April 2021. She also serves as a member of the Nominating and Corporate Governance Committee. She has received and continues to receive handsome compensation for her role at the Company, as alleged above. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. She also solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and contributed, *inter alia*, the re-election of herself and

Defendants Lefkofsky, Barris, Belcher, Epstein, Frederick, Gottlieb, Leonsis, and West to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Moreover, Defendant Doudna has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein. For these reasons, Defendant Doudna breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

175. Additional reasons that demand on Defendant Epstein is futile follow. Defendant Epstein has served as a Company director since February 2024. He also serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. He has received and continues to receive handsome compensation for his role at the Company, as alleged above. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and contributed, *inter alia*, the re-election of himself and Defendants Lefkofsky, Barris, Belcher, Doudna, Frederick, Gottlieb, Leonsis, and West to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Moreover, Defendant Epstein has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein. For these reasons, Defendant Epstein breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

176. Additional reasons that demand on Defendant Frederick is futile follow. Defendant Frederick has served as a Company director since October 2020. He also currently serves as a member of the Audit Committee. He has received and continues to receive handsome compensation for his role at the Company, as alleged above. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and contributed, *inter alia*, the re-election of himself and Defendants Lefkofsky, Barris, Belcher, Doudna, Epstein, Gottlieb, Leonsis, and West to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Frederick breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

177. Additional reasons that demand on Defendant Gottlieb is futile follow. Defendant Gottlieb has served as a Company director since October 2019. He also serves as a member of the Nominating and Corporate Governance Committee. He has received and continues to receive handsome compensation for his role at the Company, as alleged above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also solicited the 2025 Proxy Statement, which contained material

misrepresentations and omissions and contributed, *inter alia*, the re-election of himself and Defendants Lefkofsky, Barris, Belcher, Doudna, Epstein, Frederick, Leonsis, and West to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Gottlieb breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

178. Additional reasons that demand on Defendant Leonsis is futile follow. Defendant Leonsis has served as a Company director since January 2019. He also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Executive Committee. He has received and continues to receive handsome compensation for his role at the Company. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and contributed, *inter alia*, the re-election of himself and Defendants Lefkofsky, Barris, Belcher, Doudna, Epstein, Frederick, Gottlieb, and West to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Moreover, Defendant Leonsis has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein. For these reasons, Defendant Leonsis breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

179. Additional reasons that demand on Defendant West is futile follow. Defendant

West has served as a Company director since April 2021. She also serves as a member of the Compensation Committee. She has received and continues to receive handsome compensation for her role at the Company, as alleged above. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. She also solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and contributed, *inter alia*, the re-election of herself and Defendants Lefkofsky, Barris, Belcher, Doudna, Epstein, Frederick, Gottlieb, and Leonsis to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Moreover, Defendant West has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made an insider sale while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein. For these reasons, Defendant West breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

180. Additional reasons that demand on the Board is futile follow.

181. Defendants Belcher (as Chair), Barris, and Frederick (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including

breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

182. All of the Director-Defendants breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's business, operations, and prospects, despite having knowledge of the falsity of those statements. The Director-Defendants may not be indemnified for breaching the duty of candor. As a result, all of the Director-Defendants face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

183. In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

184. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and

intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

185. The acts complained of herein constitute violations of fiduciary duties owed by Tempus' officers and directors, and these acts are incapable of ratification.

186. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Tempus. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Tempus, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

187. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Tempus to sue the Individual Defendants named herein, since, if they

did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

188. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934

189. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

190. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

191. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

192. Under the direction and watch of Defendants Lefkofsky, Barris, Belcher, Doudna, Epstein, Frederick, Gottlieb, Leonsis, and West, the 2025 Proxy Statement failed to disclose that:

(1) a substantial number of the Company's contractual agreements were with related parties, self-funded, or otherwise included non-binding opt-ins; (2) as a result of the foregoing, the Company's contractual agreements were neither as assured nor as profitable as previously disclosed to investors; (3) Tempus' joint venture with SoftBank carried undertones of "round-tripping" capital to generate revenue for the Company; (4) as a result of these undertones, Tempus' joint venture was neither as credibly nor as substantive as previously disclosed to investors; (5) Tempus' acquisition of Ambry generated substantial risk to the Company given Ambry's ethically questionable billing practices; (6) AstraZeneca engaged in a "pass-through payment" through a joint agreement with itself, the Company, and Pathos AI; (7) as a result of AstraZeneca's pass-through payment, its financial commitments to Tempus were significantly reduced; and (8) the Company failed to maintain internal controls. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

193. Under the direction and watch of Defendants Lefkofsky, Barris, Belcher, Doudna, Epstein, Frederick, Gottlieb, Leonsis, and West, the 2025 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

194. In the exercise of reasonable care, Defendants Lefkofsky, Barris, Belcher, Doudna, Epstein, Frederick, Gottlieb, Leonsis, and West should have known that by misrepresenting or

failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2025 Proxy Statement, including election of directors, the ratification of the appointment of an independent registered public accounting firm, and the reincorporation of the Company to the State of Nevada by conversion.

195. As a result of the material misstatements and omissions contained in the 2025 Proxy Statement, Company shareholders voted to, *inter alia*, re-elect Defendants Lefkofsky, Barris, Belcher, Doudna, Epstein, Frederick, Gottlieb, Leonsis, and West to the Board, thus allowing them to continue breaching their fiduciary duties to Tempus.

196. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2025 Proxy Statement.

197. Plaintiff, on behalf of Tempus, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

198. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

199. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Tempus' business and affairs.

200. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

201. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual

Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Tempus.

202. In breach of their fiduciary duties owed to Tempus, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) a substantial number of the Company's contractual agreements were with related parties, self-funded, or otherwise included non-binding opt-ins; (2) as a result of the foregoing, the Company's contractual agreements were neither as assured nor as profitable as previously disclosed to investors; (3) Tempus' joint venture with SoftBank carried undertones of "round-tripping" capital to generate revenue for the Company; (4) as a result of these undertones, Tempus' joint venture was neither as credibly nor as substantive as previously disclosed to investors; (5) Tempus' acquisition of Ambry generated substantial risk to the Company given Ambry's ethically questionable billing practices; (6) AstraZeneca engaged in a "pass-through payment" through a joint agreement with itself, the Company, and Pathos AI; (7) as a result of AstraZeneca's pass-through payment, its financial commitments to Tempus were significantly reduced; and (8) the Company failed to maintain internal controls. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

203. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

204. Also, in breach of their fiduciary duties, the Individual Defendants caused the

Company to fail to maintain internal controls.

205. In yet further breach of their fiduciary duties, during the Relevant Period, six of the Individual Defendants engaged in lucrative insider sales, netting proceeds of over $269.3 million.

206. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Tempus' securities.

207. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Tempus' securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

208. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

209. As a direct and proximate result of the Individual Defendants' breaches of their

fiduciary obligations, Tempus has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

210. Plaintiff, on behalf of Tempus, has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

211. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

212. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Tempus.

213. The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from Tempus that was tied to the performance or artificially inflated valuation of Tempus, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company. Additionally, six of the Individual Defendants engaged in insider selling of Tempus stock based on material non-public information. The proceeds of those sales should be disgorged.

214. Plaintiff, as a shareholder and a representative of Tempus, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

215. Plaintiff, on behalf of Tempus, has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

216. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

217. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Tempus, for which they are legally responsible.

218. As a direct and proximate result of the Individual Defendants' abuse of control, Tempus has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

219. Plaintiff, on behalf of Tempus, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

220. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

221. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Tempus in a manner consistent with the operations of a publicly held corporation.

222. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Tempus has sustained and will continue to sustain significant damages.

223. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

224. Plaintiff, on behalf of Tempus, has no adequate remedy at law.

## SIXTH CLAIM

**Against Individual Defendants for Waste of Corporate Assets**

225. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

226. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

227. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Tempus to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

228. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

229. Plaintiff, on behalf of Tempus, has no adequate remedy at law.

## SEVENTH CLAIM

**Against Defendants Lefkofsky and Rogers for Contribution Under Sections 10(b) and 21D of the Exchange Act**

230. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

231. Tempus, Defendant Lefkofsky, and Defendant Rogers are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Lefkofsky's and Rogers' willful and/or reckless violations of their obligations as officers and/or directors of Tempus.

232. Defendants Lefkofsky and Rogers, because of their positions of control and authority as CEO and CFO, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Tempus, including the wrongful acts complained of herein and in the Securities Class Action.

233. Accordingly, Defendants Lefkofsky and Rogers are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

234. As such, Tempus is entitled to receive all appropriate contribution or indemnification from Defendants Lefkofsky and Rogers.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Tempus, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that each of the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Tempus;

(c) Determining and awarding to Tempus the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Tempus and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Tempus and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the

following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Tempus to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e) Awarding Tempus restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

Dated: August 18, 2025

Respectfully submitted,

*/s/ Eric Lechtzin*
Eric Lechtzin (I.D. # 248958)
EDELSON LECHTZIN LLP
411 S. State Street, Suite N-300
Newtown, PA 18940
Telephone: (215) 867-2399
Facsimile: (267) 685-0676
elechtzin@edelson-law.com

*Counsel for Plaintiff*

# VERIFICATION

I, JACOB CURTIS, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this date, 8/18/2025.

Signed by:
Jacob Curtis
160171EAB38743B...